## Ratcliff et al. v. Meade et al.

(Decided November 9, 1928.)

### Appeal from Martin Circuit Court.

Adverse Possession.—Where owners of adjoining land claimed land in question, and sold timber off of it, and their tenants cut timber off of it, but they never occupied any portion of it, there was no adverse possession such as is required to give title.

KIRK, KIRK & WELLS and M. S. BURNS for appellants.

W. R. McCOY for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—Affirming.

The trial court adjudged William T. Meade and Frank B. Beddall to be the owners of a tract of land containing 64 acres, more or less, lying between Tug fork and Wolf creek, from which judgment John F. Ratcliff and Dr. L. H. York, the defendants in the trial court, have appealed.

In 1796 Rev. James Madison, by appropriate steps, acquired title to 1,106 acres of land lying on the waters of Wolf creek and the waters of Tug river. It appears that the Rev. Madison regarded as valuable the land nearest this creek and this river, and the plat of his survey would indicate that he was endeavoring to acquire the tillable land. There was another tract of land which lay upon the western slope of the ridge between Wolf creek and Tug river, and this land upon the western side of that slope came into the possession of a Mr. Kirk, referred to in this record as "Big Tom Kirk." It is admitted here that Kirk owned the land on the Wolf creek or western side of this slope to the summit of the ridge. The contention here is about the land on the eastern or Tug fork side of this slope. In 1911 one W. S. Kirk, conceiving that this was vacant land, took appropriate steps, and a patent was issued to him for the land on the eastern slope of this ridge from the summit thereof down to what Meade and Beddall say is the western line of the Madison survey.

It is admitted in this record that York and Ratcliff and their vendors have been for many years in possession of the western part of the Madison survey, have had tenants thereon, and have exercised control and ownership

thereof. There is also evidence to the effect that these tenants of theirs living on this Madison survey, have cut timber on the tract of land that lies west of the Madison survey, between it and the crest of the ridge that divides the waters of Tug river from the waters of Wolf creek, and which is the land in controversy. There is some proof that York and Ratcliff, and those under whom they claim, have sold timber off this tract of land, but there is, on the other hand, evidence offered on behalf of Meade and Beddall putting these things in dispute. Granting that York and Ratcliff have claimed this land, that they have sold timber off of it, and their tenants have cut timber off of it, they never occupied any portion of it, and had no adverse possession of it, such as is required to give title. In the case of Swango v. Kentucky Coal & Timber Development Co., 200 Ky. 522, 255 S. W. 114, we said:

> "The fact that Shepherd had the actual possession of a nearby or adjoining tract of land did not give him such possession of the land in controversy as would ripen into a title by adverse possession."

The claim of Shepherd to the land in controversy in that case and the occupancy of an adjoining tract by Shepherd is very similar to the occupancy by York and Ratcliff of this Madison survey, and their claim to this adjoining land. In each instance, timber had been cut off of it, and claims made to it, and it would seem that, under the authority of the Swango case, the claim of York and Ratcliff to adverse possession of this property cannot be upheld. Numerous other cases to the same effect can be found in West's Digest (Decennials) under the title of adverse possession Key-Number 16, and in the first five volumes under the same title, section 9.

This case has given us no little difficulty. The parties made an agreement that W. W. Brown should go upon and survey the land in controversy, and to do such additional surveying of the lands of either party as either party might direct, and that he should prepare a map and report to be filed in the action. He did this surveying, prepared a report and made a map, to which Meade and Beddall, filed exceptions. Brown's deposition was never taken to sustain his report, or to amend or explain either it or his plat. We have both of them before us, and to us they are absolutely meaningless. He attempts to trace on his map the lines of the property he surveyed,

but does not give many courses or distances, does not indicate where he began or where he left off, nor does he give any boundary of lands he surveyed, in his report, which, if given, might have enabled us to have made a plat of our own. His map indicates he did a lot of work. The mere preparation of the map would require considerable time, and to gather the data necessary for its preparation would require a great deal more, but, in the absence of proof to explain it, we are utterly unable to comprehend it. All it shows is a number of overlapping and conflicting lines, the length of which are not given, and the relation of which to each other are entirely unexplained. The trial court found that no part of the land claimed by Meade and Beddall, and patented by Kirk, from whom they purchased it, lies within the James Madison survey, and the evidence abundantly supports that finding.

The defendants York and Ratcliff claim to own land derived from other sources than the Madison survey that did embrace the land in controversy, and that they had had possession of that for more than a quarter of a century, but the trial court found against them. The evidence is conflicting, and seems to support the finding of the trial court. At least, we are left in such doubt that we cannot say the trial court erred.

As one of their defenses to the claims of Meade and Beddall, York and Ratcliff claim that the land patented by Kirk in 1911, and now owned by Meade and Beddall, had been previously patented to other parties, and again the evidence is conflicting, and we are in such doubt that we are unable to say the finding of the trial court is erroneous.

It follows, therefore, that the judgment of the trial court must be, and it is, affirmed.